FILED

2007 Feb-15  PM 01:54
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| CHERLYN KINSEY, | ) |
| | ) |
|     PLAINTIFF, | ) |
| | ) |
| vs. | )      **2:05-cv-01220-JHH** |
| | ) |
| ENTERPRISE LEASING | ) |
| COMPANY and ENTERPRISE | ) |
| LEASING SOUTH CENTRAL, INC., | ) |
| | ) |
|     DEFENDANTS. | ) |

## MEMORANDUM OPINION

The court has before it the November 29, 2006 first motion (doc. #25) of

defendant Enterprise Leasing Company South-Central, Inc. ("Enterprise")[1] for

summary judgment.  Pursuant to the court's October 5, 2006 order (doc. #24), the

first motion for summary judgment is now under submission.

## I.    Procedural History

Plaintiff Cherlyn Kinsey commenced this action by filing a complaint in this

court on June 6, 2005, alleging that her current employer, defendant Enterprise,

violated Title VII of the Civil Rights Act by denying her promotions because of

---

[1] According to defendant's first motion (doc. #25) for summary judgment, Enterprise
Leasing Company South-Central, Inc. is the only company with whom plaintiff has been
employed, and therefore it is the only proper defendant.  (See Doc. #25 at 1, n.1.)

her race and gender.  (See Doc. #1 at Counts I, II.)  She also alleges that Enterprise

violated 42 U.S.C. § 1981 by denying her promotions because of her race, black

(see doc. #1 at Count II) and retaliated against her in violation of Title VII and 42

U.S.C. § 1981 (see doc. #1 at Count III).[2]  Defendant's November 29, 2006 first

motion (doc. #25) for summary judgment asserts that: (1) all of Kinsey's Title VII

claims predating March 15, 2004 are time-barred; (2) plaintiff cannot establish a

prima facie case of discrimination for the challenged positions; (3) the record

evidence demonstrates that plaintiff was not denied any promotion because of her

race or gender; and (4)[3] even if plaintiff can establish a prima facie case of

promotion discrimination, the record evidence demonstrates that defendant

selected another candidate for legitimate, non-discriminatory reasons.  (See Doc.

#25 at ¶¶ 1-4.)

---

[2] Plaintiff's initial complaint also alleges pay discrimination (see doc. #1 at ¶¶ 19-20, 27-28) and violations of the Equal Pay Act (see doc. #1 at Count IV).  However, those claims have been dismissed as per the parties' Joint Response (doc. #21) to May 4, 2006 Order.  "The parties hereby stipulate to the dismissal with prejudice of all of Plaintiff's pay discrimination claims as set forth in Count I paragraphs 19-20, Count II paragraphs 26-27, and Count IV."  (Doc. #21 at 2.)

[3] Although the first motion (doc. #25) contains paragraphs 1, 2, 3, and 2, the court recognizes that this last "2" is a typo, and regards it as a "4."

On November 29, 2006, defendant filed a brief (doc. #26) and evidence[4] in

support of its first motion.  Plaintiff filed a response (doc. #27) and evidence[5]

(doc. #28) in opposition to the motion on December 21, 2006.  Defendant filed a

reply brief (doc. # 31) to plaintiff's opposition on January 9, 2007.

The first motion (doc. #25) for summary judgment is considered herein.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper

"if the pleadings, depositions, answers to interrogatories, and admissions on file,

---

[4] Defendant submitted the following evidence: (1) plaintiff's February 14, 2006 depositions with exhibits; (2) the depositions of Mike Brady, Jesse Richardson, Chad Goodrich, and Sheila K. Fondren, with exhibits; (3) the declarations of Christi Tompkins, Alan Josiah, and Sheila Kay Fondren; (4) Enterprise's Response to Order on Motion to Compel; and (5) Joint Response to May 4, 2006 Order with exhibits.  (See Doc. #25.)

[5] Plaintiff submitted the following evidence: (1) Joint Chart in Response to Court's Order (Exh. A); (2) rental review dated 4/21/04 – Enterprise/Kinsey D0012 (Exh. B); (3) Enterprise's position statement to EEOC (Exh. C); (4) Enterprise/Kinsey D01965 – handwritten note on Promotion Flow Log (Exh. D); (5) Enterprise/Kinsey D01964 (Exh. E); (6) new hire sheet – John Warnock (Exh. F); (7) memoranda dated July 10, 2003 and September 15, 2003 (Exh. G); (8) management matrix for Gardendale – ABM (Exh. H); (9) voluntary separation checklist – Kara Dehart (Exh. I); (10) rental review – Ben Mitchell (Exh. J); (11) memorandum regarding probation (Exh. K); (12) reprimand – Ben Mitchell (Exh. L); (13) Mitchell's payroll change notice forms (Exh. M); (14) document regarding bonus (Exh. N); (15) voluntary separation checklist – Robert Hallowell – Enterprise/Kinsey D008891 (Exh. O); (16) management matrix for Trussville – 01/04 (Exh. P); (17) new hire sheet – Christy White – Enterprise/Kinsey D01248 (Exh. Q); (18) promotion flow log (Pell City) (Exh. R); (19) payroll change notice – August 2, 2004 (Exh. S); (20) matrix for Trussville promotion – D0111-D0112 (Exh. T); (21) payroll change notice – April 18, 2005 (Exh. U); (22) 90 day review – D01504 (Exh. V); (23) Enterprise memorandum regarding the matrix (Exh. W); (24) promotion flow log (Trussville) (Exh. X); (25) deposition transcript of Jason Blevins (Exh. Y); (26) deposition transcript of Chris Tanley (Exh. Z); and (27) deposition transcript of Dion Bell (Exh. AA).

together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to judgment as a matter of law."

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229

F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always

bears the initial responsibility of informing the court of the basis for its motion and

identifying those portions of the pleadings or filings that the moving party believes

demonstrate the absence of a genuine issue of material fact.  Celotex Corp., 477

U.S. at 323.  Once the moving party has met its burden, Rule 56(e) requires the

nonmoving party to go beyond the pleadings and by her own affidavits, or by the

depositions, answers to interrogatories, and admissions on file, designate specific

facts showing that there is a genuine issue for trial.  Id. at 324.

The substantive law will identify which facts are material and which are

irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Chapman,

229 F.3d at 1023.  All reasonable doubts about the facts and all justifiable

inferences are resolved in favor of the nonmovant.  Chapman, 229 F.3d at 1023;

Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is

genuine "if the evidence is such that a reasonable jury could return a verdict for

the nonmoving party." Anderson, 477 U.S. at 248; Chapman, 229 F.3d at 1023.  If

the evidence is merely colorable, or is not significantly probative, summary

4

judgment may be granted.  <u>Anderson</u>, 477 U.S. at 249-50.  The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  <u>See</u> <u>Fitzpatrick</u>, 2 F.3d at 1115-17 (citing <u>United States v. Four Parcels of Real Property</u>, 941 F.2d 1428 (11th Cir. 1991) (<u>en banc</u>)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact (i.e. facts that would entitle it to a directed verdict if not controverted at trial).  <u>Fitzpatrick</u>, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the nonmoving party to produce significant, probative evidence demonstrating a genuine issue for trial.

    If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the nonmoving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the nonmoving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.  The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to

affirmatively show the absence of evidence in the record to support a judgment for

the nonmoving party on the issue in question.  This method requires more than a

simple statement that the nonmoving party cannot meet its burden at trial but does

not require evidence negating the nonmovant's claim; it simply requires the

movant to point out to the district court that there is an absence of evidence to

support the nonmoving party's case.  Fitzpatrick, 2 F.3d at 1115-16.  If the movant

meets its initial burden by using this second method, the nonmoving party may

either point out to the court record evidence, overlooked or ignored by the movant,

sufficient to withstand a directed verdict, or the nonmoving party may come

forward with additional evidence sufficient to withstand a directed verdict motion

at trial based on the alleged evidentiary deficiency.  However, when responding,

the nonmovant can no longer rest on mere allegations, but must set forth evidence

of specific facts.  Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing Lujan v.

Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

## III.    Relevant Undisputed Facts[6]

## A.    Background

---

[6] If the facts are in dispute, they are stated in the manner most favorable to the nonmoving party.  See Fitzpatrick, 2 F.3d at 1115.

Plaintiff began working for Enterprise on April 29, 2002 as a Management Trainee ("MT") at the Gardendale branch. (See Pl. Dep. at 17-18, 21.) MT is an entry-level position requiring employees, after 6 to 18 months, to take a test (in company lingo, a "grill") for a promotion to Management Assistant ("MA"). (See id. at 18.) Plaintiff passed the grill on her first attempt, just prior to her first anniversary with Enterprise. (See id.) She assumed the role of MA in April 2003 at the airport branch. (See id. at 18, 45.) Then sometime later in 2003, she was selected to become part of Enterprise's diversity team.[7] (See id. at 13-15.)

While working at the airport branch, plaintiff was asked by area manager Mike Brady if she would be willing to move to the Hoover branch (store number 5511) due to the fact that they were having problems with their customer service score (in company lingo, "ESQI"). (See id. at 45.) Plaintiff agreed to the move in part because Leland Smith, branch manager, had told her that "step[ping] up . . . getting yourself transferred to big branches . . . helps you get promoted and shows them [Enterprise] that you are a strong leader." (Id. at 52-53.)

After working at the Hoover branch for some period of time, Kinsey moved to the Roebuck branch (store number 5514). "When they transferred me over

_____

[7] As a member of the diversity team, plaintiff's continuing role is to help improve diversity issues for the company. (See Pl. Dep. at 15.)

there, they said that the branch was – it was, like, a 68 ESQI, and they needed

some strong MAs to go, so they asked me, you know, would I go back . . . I didn't

have any problems with that." (Id. at 46.) Plaintiff remained at 5514 until

November 2005, at which point she went to Trussville, store 551T. (See id. at 47.)

She was transferred back to the Roebuck branch in January 2006 and remains

there today. (See id. at 31, 47.)

Throughout her continuing tenure as a MA, plaintiff has applied for

promotions on 17 different occasions for vacant positions in Birmingham,

Anniston, and Pell City. (See generally Doc. #21.) Plaintiff was denied each of

the promotions for which she applied. (See id.; see also generally Compl.)

Plaintiff filed a charge of discrimination with the Equal Employment

Opportunity Commission ("EEOC") on September 10, 2004, alleging that she had

been discriminatorily denied 9 specific promotions. "The following less qualified

whites and males[8] have been promoted over me in the last six months into the

following positions for which I applied: (1) John Warnock, white male, to

Gardendale Assistant Manager; (2) Kara Dehart, white female, to Southern

---

[8] Both the EEOC charge and the complaint allege that these, and all other positions for which plaintiff was passed over, were filled discriminatorily on the basis of race *and* gender. (See generally Compl.) However, plaintiff recognizes in her Response to Defendant's First Motion for Summary Judgment that she cannot make a prima facie case of discrimination unless a person who was not a member of her protected class was promoted. (See Doc. #27 at 32.) Therefore, the court will consider only the relevant basis of discrimination herein.

Company Services Assistant Manager; (3) Robert Halloway, white male, to Trussville Assistant Manager; (4) John Bailey, black male, to Downtown Assistant Manager; (5) Christy White, white female, to Tom Williams Assistant Manager; (6) Daniel Spencer a black male to Pell City Assistant Manager; (7) Scott Kraft to Trussville Assistant Manager; (8) Ten Clay, white male Mgt. trainee to Enterprise Trucking Leasing Mgt. Ast., which allows for automatic promotion to Ast. Mgr.; and (9) Cathy Loftin, white female, to HR Mgr. and other positions." (Doc. #11.) In additional pleadings, plaintiff identifies the Alabama Power Company Assistant Branch Manager position and the Van Branch Assistant Manager position as two additional times in 2003 and 2004 that she was discriminatorily passed over for a promotion.[9]

As a general matter, plaintiff *believes* that she was discriminatorily denied the above-named promotions because "I have interviewed with several different people and they were promoted over me.  I *felt like* going into my interviews, I

---

[9] In accordance with the court's October 5, 2006 order (doc. #24), the proper subject of any first motion for summary judgment should have been the above-outlined 11 positions, thus reserving 6 positions for discussion with any second motion for summary judgment.  However, defendant apparently mis-read the court's order (doc. #24) and included the Alabama Power Company and Van Branch positions within its second motion for summary judgment instead of its first.  (See Doc. #31 at 3; see also Doc. #30 at 2-4 and Doc. #26.)  Plaintiff has not been prejudiced in any way by this error.  Therefore, any motion for summary judgment relating to the Alabama Power Company and Van Branch promotions will be under submission as of January 29, 2007.

was prepared, I trained them, and they were promoted over me.  I *felt like*

something has to do with that.  I trained them to – if I was good enough to show

these people how to work and train them, do the skills that I'm doing now, I *felt*

*like* I should have been promoted a long time ago."  (Pl. Dep. at 109-10, 204-08)

(emphasis added.)  "It was always said that if you step up that way and you go in

and work the branches and you help them out, that helps you get promoted . . .

When they came to me, I didn't turn it down.  I said yes, I will go and help."  (Id.

at 205-06, 210.)

### B.    The Internal Promotion Process at Enterprise

Enterprise promotes employees internally from the MA position to the

Assistant Branch Manager ("ABM") position.  (See Brady Dep. at 11.)  When an

ABM position becomes available, an internal message is sent out to employees

describing the position and asking applications to be sent to area managers and

HR.  (See id.)  Once the deadline for applications has passed, a matrix is compiled

for each applicant.  (See id. at 12.)  Enterprise explained the matrix system to all

employees by memo dated March 17, 2003:

> Effective April 1st [2003] every region in our group will use the same matrix to
> "rank" individuals whose name is submitted for promotion candidacy.  This is not
> a new concept as we have always ranked employees who are available for
> promotion to determine who will be granted an interview.  What has changed is
> how the names will be submitted.  And, we are going to be very clear about what

is being ranked on the matrix.  Below is how the matrix will work, based on position currently held.

## MANAGEMENT ASSISTANT –> ASSISTANT MANAGER

Ranking areas will include:
- Package sales[10] (for previous 6 months)
  - -- Corporate business will be removed from this number for Matrix purposes.  Also, the branch average will be looked at in determining your performance in this area.
- Employee referrals[11] (previous 6 months)
- Corporate Account Leads[12] (previous 6 months)
- ESQI[13] (6 mos. Score)

All these things are within personal control and worthy of attention from management in determining who should be interviewed for promotion.  These are also areas where there is an opportunity to prove leadership, responsibility and ownership that comes with following the management career.

. . .

## PURPOSE OF THE MATRIX
The purpose of the matrix is to see how employees rank among each other.  It is a way to make sure that only the best performers are given the opportunity to interview for promotion.  Overall ranking on the matrix DOES NOT make final promotion decisions final.  This ranking only allows the interviewer a way to

---

[10] Package sales track an employee's ability to sell insurance to Enterprise customers.  (See Pl. Dep. at 55.)  Plaintiff does not believe that the package sales tracking is influenced in any way by race or gender.  (See id. at 58.)

[11] Employee referrals track the number of job applicants referred to the company by each employee.  (See Pl. Dep. at 58-59.)  Plaintiff does not believe that the employee referral process in influenced in any way by race or gender.  (See id. at 61.)

[12] Corporate account leads occur when an employee refers a potential corporate or business customer to Enterprise.  (See Pl. Dep. at 61-62.)  Plaintiff does not believe that the corporate lead tracking is influenced in any way by race or gender.  (See id. at 63-64.)

[13] ESQI is a customer service score.  (See Pl. Dep. at 48-49.)  Employees do not receive a personal ESQI score.  (See id.)  ESQI is a branch score and applies to all employees in a particular location.  (See id.)  Plaintiff does not believe that the ESQI score is in any way influenced by race or gender.  (See id. at 64.)

11

distinguish who is the "best of the best" in measurable performance areas for purposes of interview selection. This also DOES NOT mean that the person who ranks top on the matrix will automatically be selected for the promotion. The interview will play a large role in the selection process. The areas of performance that cannot be measured on paper such as leadership, enthusiasm, ability to communicate, and eagerness for the opportunity – all these areas are critical in making these very important decisions.

(Doc. #28, Exh. W.)

Based on a review of the matrix, the area manager determines who will be interviewed for the available position. (See Brady Dep. at 12-14.) Generally, the top five candidates based upon review of the matrix would be interviewed, unless "there was a tie or a natural break." (Id. at 14; see also Goodrich Dep. at 14.) That is, the interviewers have the authority to extend interviews to more than five applicants.[14] (See Doc. #28, Exh. C at 2; see also Goodrich Dep. at 14 and Fondren Dep. at 55-58.) The remaining candidates, in Enterprise's terms, have been "matrixed out," or, not selected for an interview based on application of the matrix. (See Brady Dep. at 14.)

When individuals are interviewed, they are expected to go in with a plan to improve the branch. (See Pl. Dep. at 133.) "Basically, you put yourself a plan

---

[14] Area manager Mike Brady testified that company policy at the time was to only interview the top five candidates as ranked on the matrix, unless there was a tie or a natural break. (See Brady Dep. at 14.) However, all other decisionmakers testified that they had discretion to interview even those candidates who ranked lower than five on the matrix, regardless of whether there was a tie or natural break.

together for the interview; what you're going to talk about by looking at their numbers." (Id.)

### C.    Promotion Decisions made by Area Manager Jessie Richardson

Jessie Richardson held the position of area rental manager in Birmingham from August 2000 until February 2006.  (Richardson Dep. at 7.)  He was promoted to the group rental manager position in early 2006 and is now working for Enterprise in Louisville, Kentucky.  (See id.)

During his tenure in Birmingham, Richardson had the opportunity to work with plaintiff at the Gardendale location.  (See id. at 13.)  He perceived her performance as average, "below average in sales, above average with customers." (Id.)  Moreover, Richardson had the opportunity to interview plaintiff for promotions on several different occasions.  He consistently found her to be "poor at preparation and . . . [without] specific game plans or knowledge."  (Id. at 24-25.)  As a result, Richardson offered plaintiff, on several different occasions, the opportunity to meet with him prior to an interview to help her prepare.  (See id. at 37.)  Plaintiff never took Richardson up on this offer.  (See id.)

### 1.  The Gardendale Position (551K)

In January 2004, Enterprise had an opening for an AM at the Gardendale location.  In accordance with the internal promotion procedure, eight individuals

13

applied for the position.  (See Exh. 1 to Richardson Dep. at D0104.)  Upon review

of the matrix, the top five individuals were selected for interviews.  (See

Richardson Dep. at 30.)  Richardson conducted the interviews and ultimately

chose John Warnock for the promotion.  (See id. at 29-30.)

Richardson chose Warnock because:

> He had the best interview, had the best performance, was a very
> strong candidate, and had a good action plan for the Gardendale
> location.  I remember in the interview process that he had prepared a
> packet and had a very detailed plan on what he was going to do with
> the store when he got there as an assistant manager.

(Id. at 31.)

Richardson did not consider Warnock's ranking on the matrix because "the matrix,

what I use it for – I think in theory what it's used for is to find out who the top five

people are.  If you're number one or number five, it really doesn't matter.  It's

what you bring to the interview, your knowledge of the business, and how well

you're prepared to take on the next opportunity."  (Id. at 32) (emphasis added.)

Richardson did not choose Kinsey for the Gardendale position because "she

had only prepared a one-dimensional approach to the new office, and it was all

based on customer service and what she was going to do to increase the customer

14

service.  She had no specific action plan for profitability and growth, and those

were things at that time that that office needed."[15]  (Id. at 33.)

Plaintiff *believes* that she was not selected for this position because of her

race and gender.  (See Pl. Dep. at 146-47; see also Doc. #27 at 32.)  As to her race

claim:

> The evidence that I have, whenever they needed help at a different
> branch or even in Jessie's area and the help that they wanted to come
> to another branch to come out and help out, they always called on
> Cherlyn.  They called my manager and ask if Cherlyn could come
> over and help at that branch.  I felt like, you know, if you can call me
> to work in your area and help your area out, why can't I be promoted
> when a position comes up.  I felt like if you know I can do the
> position when you call for help, why can't I get the assistant manager
> position . . . he's a white male . . . I have been with the company
> longer than him.[16]  I knew how to work that branch better than him."

(Pl. Dep. at 147-49.)

As to her gender claim, plaintiff states: "he's a white male and I'm a black

female.  I *felt like* – like I said once before, again, I've been with the company

longer, I knew the skills, I knew how to run that branch.  He would ask me to

come over and work that branch for him when he didn't have the people there, so I

---

[15] Similarly, Christy White, Ethan Dorman, and Allyson Brown were not selected for the
position because they had not demonstrated their plans for improving the branch.  (See Exh. 1 to
Richardson Dep. at D0106.)

[16] Plaintiff was not told that seniority was considered in the decision making process.
(See Pl. Dep. at 148.)

15

acted as an assistant manager then.  So coming in, when I went into that interview, I *felt like* I had a stronger background than John Warnock did."  (Id. at 154) (emphasis added.)

### 2.  The Southern Company Branch Position (55X1)

On April 4, 2004, Enterprise filled an ABM position at the Southern Company Branch (store number 55X1).  (See Doc. #21, Exh. A at 2.) Richardson selected Kara Dehart, a white female, for the position.  (See id.)  Enterprise's records show that plaintiff was not interviewed for the Southern Company Branch position (along with two other of the eight applicants) because she "matrixed out." (See Exh. 1 to Richardson Dep. at D0118, D0133; see also Doc. #21, Exh. A at 2.) However, plaintiff testified that she was in fact interviewed for this position by Richardson and Brandon Baker.  (See Pl. Dep. at 119.)  Therefore, for the purpose of summary judgment, the court will assume that plaintiff was in fact interviewed for the position.

Richardson chose Dehart for the position because she had an excellent interview, a strong action plan, understood the operation at the satellite office, was a top performer, and was always highly recommended.[17]  (See Richardson Dep. at

---

[17] "Always recommended, a go-to person in the office.  You name it, she did it.  She was great."  (Richardson Dep. at 38.)

38.)  In addition, Richardson had worked with Dehart in the past and knew first-hand that she was a top performer.  (See id. at 39.)

Plaintiff first testifies that she *does not know* if she was rejected for this position because of her race[18]  (see id. at 120-21) but then later states her *belief* that race played a role in the decision (see id. at 157).  "She's [Dehart's] a white female and I had a stronger background than her.  I had been with the company longer than her."  (Id. at 122.)  "I had better – stronger skills than her.  I prepared myself for that interview."  (Id. at 157.)

### 3.  The Downtown Position[19] (5512)

In October 2003, Enterprise posted a vacancy for an AM at branch 5512, the downtown location.  (See Richardson Dep. at 18; see also Exh. 1 to Richardson Dep. at D0117)  Nineteen individuals applied for the position and seven were interviewed.  (See id.; see also Richardson Dep. at 19.)

At the conclusion of the interviews, Richardson failed to complete a promotion flow log.  (See id. at 22-23; see also Exh. 1 to Richardson Dep. at

---

[18] Plaintiff specifically abandons the notion that she was denied this position because of her gender.  (See Pl. Dep. at 160; see also Doc. #27 at 32..)

[19] The facts related to this promotion are recounted herein solely on plaintiff's theory of supporting circumstantial evidence.  Plaintiff has abandoned her claims for promotion discrimination as related to this position.  "Plaintiff agrees that summary judgment is due to be granted with respect to [this] particular promotion."  (Doc. #27 at 3.)  Therefore, summary judgment is due to be granted as to all of plaintiff's claims regarding the downtown position.

D0179.)  However, Richardson specifically recalls that "the race" for the position

after the interviews was between Bailey and Harris.  (See Richardson Dep. at 23.)

"John Bailey was a very strong communicator and came highly recommended

from his branch manager and his previous area manager and had an incredible

interview . . . We agreed to go with John Bailey because of John's strong

communication and professionalism."  (Id.)


### D.    Promotion Decisions made by Area Manager Mike Brady[20]

Mike Brady is currently the national marketing manager for Enterprise.

(Brady Dep. at 6.)  Prior to assuming the national position, Brady was an area

manager in plaintiff's district.  (See id. at 7, 11.)  When ABM positions became

available in his area, Brady would communicate a description of the opening to

---

[20] In her deposition, plaintiff was asked whether she felt Brady did anything to her
because of her race or gender.  She answers in the negative.

> Q:    Do you believe Mr. Brady ever took any action against you because of your race?
> A:    I really can't answer that question for you.
>
> Q:    I will ask it this way: Do you allege in this lawsuit that Mr. Brady did something
>        to you at Enterprise because of your race?
> A:    At this time, I can say no, I really can't recall, no.
>
> Q:    Do you allege in this lawsuit that Mr. Brady did anything to you because you were
>        a woman?
> A:    No, I can't, no.

(Pl. Dep. at 66-67, 175.)

human resources and ask for applicants to respond to himself and human resources. (See id. at 11.) Once the deadline passed for applications, Brady would ask human resources (then managed by Goodrich) to comprise a matrix. (See id. at 12-13.) From the matrix, Brady would decide who would be interviewed. (See id.) Generally, Brady "took the top five unless there was a tie or natural break." (Id. at 14.) "That's what the region had decided a long time before, how many would interview." (Id. at 15.)

Prior to interviewing plaintiff, Brady had observed her working at the Roebuck branch on several different occasions. (See id. at 22-23.) From those observations, Brady believed plaintiff had a negative attitude. (See id.)

## 1.     The February Trussville Position (551T)

On February 1, 2004 Enterprise filled an open ABM position in Trussville with Robert Hallowell, a white male. (See Doc. #21 at 1.) Thirteen individuals applied for the job, and five were interviewed. (See id.; see also Exh. 1 to Brady Dep. at D0107, D0109.) Enterprise's records show that plaintiff was not interviewed for the January Trussville position because she (along with seven others) "matrixed out."[21] (See Exh. 1 to Brady Dep. at D0107-D0109; see also

---

[21] Brady says that plaintiff matrixed out for this position because her total rank was below fifth and he took the top five ranked individuals. (See Brady Dep. at 31.) "That was our – per our region and our policy at the time." (Id.)

Doc. #21, Exh. A at 1 and Brady Dep. at 31.)  Moreover, plaintiff's brief (doc. #27) states that she was not interviewed for the January Trussville position.  (See Doc. #27 at 21.) However, plaintiff unequivocally testified that she was in fact interviewed for this position by Brady.  (See Pl. Dep. at 126-28.)  Therefore, for the purpose of summary judgment, the court will assume that plaintiff was in fact interviewed for the position.

According to the Promotion Flow Log for the January Trussville position, Hallowell was selected because he presented a "great plan" for the branch.  (See Exh. 1 to Brady Dep. at D0109.)  The reasons given for not selecting the other individuals who were interviewed included: "no plan for training - experience," "not motivated, package sales," "sales, very timid, no plan for training," and "sales [illegible] concern."  (Id.)

Plaintiff *believes* that she was denied the January Trussville position because of her race and gender.  As to her race claim, plaintiff points to the fact that Hallowell is white and she is black.  (See id. at 164.)  As to her gender claim, Plaintiff points to the fact that "Robert Hallowell is one of the people that I went up against, that I trained at my branch.  As far as being with the company longer than him and knowing everything, I trained him, so as far as – like I said once before, if that plays a part in it, yes sir."  (Id. at 129, 165-166.)

20

## 2.    The Tom Williams Position (551J)

On June 15, 2004 Enterprise filled an open Tom Williams ABM position with Christy White, a white female.  (See Doc. #21, Exh. A at 2.)  Twelve individuals applied for the job and five were interviewed.  (See id.; see also Exh. 1 to Brady Dep. at D0134.)  Plaintiff was not among those interviewed because she matrixed out.  (See id. At D0134-D0135; see also Brady Dep. at 57.)

Brady testified that he selected White for the position because she had the best interview and the best game plan of what she would do to improve the numbers at that branch.  (See id. at 55.)  Others who were interviewed but not selected for the position were nervous, new to the company, and did not set out plans for growth.  (See Exh. 1 to Brady Dep. at D0135.)

Plaintiff *believes* that she was denied this position because of her race.  (See Pl. Dep. at 187.)  In support of that contention, plaintiff asserts that "she was chosen over me and I was stronger than her.  My background was stronger than Christy's."  (Id. at 188.)

## 3.    The Pell City Position (551P)

On September 1, 2004 Enterprise filled an open Pell City ABM position

with Daniel Spencer, a black male.[22]  (See Doc. #21, Exh. A at 3; see also Exh. 1

to Brady Dep. at D0121, D0136.)  The decisionmakers[23] chose Spencer because he

had a great sales plan[24] and he grew up in Pell City.  (See Doc. #21, Exh. A at 3;

see also Pl. Dep. at 141 and Brady Dep. at 42.)  Spencer:

> made some calls before the interview to people that he knew and
> basically adapted that to a sales plan . . . Daniel had worked at and
> attended the Talladega College and had come in with several names
> of administrators and people that would be able to rent cars.  And,
> also, had taken the time to call some agents in the area and how we
> could get more business from them.

(Brady Dep. at 19, 28.)

Brady testified that plaintiff was not chosen for the position because

"Cherlyn brought up the fact that she'd had a negative attitude or the perception of

a negative attitude and in the interview tried to show how she had changed that

---

[22] The interviews for this position were made contemporaneously with the interviews for
the September Trussville position.  (See Pl. Dep. at 136-137.)

[23] The decision was made collectively by Mike Brady, Matt Smith (branch manager for
Trussville), and Vann Morrison (branch manager for Pell City).  (See Doc. #21, Exh. A at 3; see
also Brady Dep. at 42.)  Apparently, Smith and Morrison were not deposed in connection with
this case.

[24] After Spencer was promoted to the Pell City position, he implemented his ideas.  (See
Brady Dep. at 19, 28.)

attitude.[25]  Also, I remember the fact that she did not have a sales plan and that she came into the interview with very low energy." (Brady Dep. at 20.)  Overall, plaintiff was "beaten" in the interview.  (See id. at 24.)

Morrison later approached plaintiff and apologized to her that she was not selected for the position.  (See Pl. Dep. at 139-40.)

> The only thing that he said to me when he came over to the branch, he stated, Cherlyn, I'm so sorry . . . I felt like you did a really good interview.  The only thing you just was asked about was your attitude, your personality, and I felt like you were the stronger person going in. He was saying stuff like that, because at the time he was trying to keep himself from crying . . . he was like, I'm sorry, because I felt like we didn't give you a raw – a good deal on it, fair chance, I mean.

(Id.)

Brady also spoke with plaintiff after she was passed over for the promotion. "If I remember, it was to give her specifics on her interview, and I told her that the lack of a sales plan hurt her and that she needed to be – show some enthusiasm or excitement and ask for the position." (Brady Dep. at 26.)

---

[25] According to Brady, this was noted on the Promotion Flow Log after Brady asked Matt and Vann for feedback from the interview.  (See Brady Dep. at 20.)  Both Matt and Vann had worked with plaintiff in the past, "and she was trying to convey to them that she had changed." (Id. at 21.)  "I remember her giving examples of what she could have done better."  (Id. at 22.)

Plaintiff *believes* that she was discriminatorily denied the Pell City position because of her gender.[26]  (See Doc. #27 at 32; see also Pl. Dep. at 142, 168.)  She holds this *belief* because "I've been with the company longer than him and I knew more than Daniel.  I was stronger than Daniel going in."  (Id. at 168-69.)

### 4.    The September Trussville Position (551T)[27]

On September 1, 2004 Enterprise filled an open Trussville ABM position with Scott Craft, a white male.[28]  (See Doc. #21, Exh. A at 3; see also Exh. 1 to Brady Dep. at D0111.)  The decision to promote Craft to the position was made collectively by Mike Brady, Matt Smith (branch manager for Trussville), and

---

[26]    Q:    Do you allege in this case that you were denied the Pell City job because you're a woman?
        A:    Like I said before, I have been with the company longer than all of them, so I really can't answer that question.
(Pl. Dep. at 142.)

[27] See footnote 22, supra.  The Trussville position was open again because Hallowell had moved to assistant at 5514.  (See Brady Dep. at 32.)

[28] According to Brady, under normal circumstances he would not have interviewed Craft for the position because of his position on the management matrix.  (See Brady Dep. at 32-33; see also Exh. 1 to Brady Dep. at D0111.)  However, "at the time there were two positions opened, 1P and 1T, so that we had individuals who were not interested in the Pell City position, only for the Trussville position, and then individuals that were interested in both . . . we basically took the top five for both positions, which came out to be eight people . . ." (Brady Dep. at 33.)  So, the fact that Craft was number five on the Pell City matrix allowed him to be interviewed for the August Trussville position as well.  (See id. at 34; see also Exh. 1 to Brady Dep. at D0121.)  Craft was *not* selected for the Pell City position because "at the time Trussville was a larger branch and Scott had a better interview than almost everybody else, so he automatically became the top person for Trussville."  (Brady Dep. at 34.)

Vann Morrison (branch manager for Pell City.  (See Doc. #21, Exh. A at 3; see also Brady Dep. at 42.)

Brady testified that Craft was selected for the position because he had the best interview.  (See id. at 34-35.)  During the interview, Craft exhibited that he had extensively prepared by looking at the branch performance and coming up with a plan to improve that performance; "not just a plan, but examples of things that he would implement."  (Id. at 35.)  In contrast, according to Brady, plaintiff "had no real plans for CDW [collision damage waiver] and growth [of the office], and those were the two areas that I was interested in."  (Id. at 36.)

Because interviews for the Pell City and Trussville positions were combined,[29] Brady and the other interviewers continued to have concerns about plaintiff's attitude.  (See Pl. Dep. at 138; see also Brady Dep. at 42.)  During the course of her interview, plaintiff "talked about attitude change for the better lately," but the interviewers considered her efforts to be inconsistent.  (Brady Dep. at 36, 45-46; see also Exh. 1 to Brady Dep. at D0113.)

Plaintiff believes that she was discriminatorily denied the September Trussville position because of her race and gender.[30]  (See Doc. #27 at 32.)  She

---

[29] See footnotes 22 and 27, supra.

[30]      Q:      Do you allege in this case that you were denied the promotion to the
                 Trussville assistant branch manager position that went to Mr. Craft

believes that her race and gender factored into the decision because "Craft is a

white guy, and as far as that, my numbers, looking at the numbers that – the paper

that you-all sent to my attorney, I had better numbers than him.  And, like I say, I

had been at the company longer than him, so I really knew the position."  (Pl. Dep.

at 171-73.)

     **E.**    **Promotion Decision made by Christi Tompkins/Chris Mundy –
The Truck Leasing Management Position (5507)**

On August 2, 2004 Enterprise filled a truck leasing management position

with Reid Ten Clay, a white male.[31]  (See Doc. #21, Exh. A at 3; see also

Tompkins Decl. at ¶ 3.)  Three individuals applied for the position, and three were

interviewed.  (See id. at ¶ 4; see also Doc. #21, Exh. A at 3.)  No management

---

|   | because of your race? |
|---|---|
| A: | Not that I can recall. |

|   |   |
|---|---|
| Q: | Okay.  Do you allege that you were denied the job in Trussville that went to Mr. Craft because of your gender? |
| A: | Like I said before, in looking at what my attorney showed me, the matrix, my numbers were better than his, and I had been with the company longer than him.  I had been working with him when he was downtown, so I *felt like* I was the better candidate than him, so that may play a part in it.  I really – that's my assumption from it. |

(Pl. Dep. at 142-143) (emphasis added.)


[31] Clay was hired as a Management Trainee, grilled and became a Management Assistant.
(See id. at ¶ 5.)

matrix was created for this position because it was not a retail rental position.

(See Tompkins Decl. at ¶ 3.)

Christi Tompkins (Group Truck Rental Manager),[32] Chris Mundy (Branch

Manager), and Alan Josiah (ABM) made the decision for Clay to occupy the

position because he had a positive attitude, was outgoing, sold himself, and asked

for the job.  (See Doc. #21, Exh. A at 3; see also Tompkins Decl. at ¶ 5.)  The

decision was made after all of the interviewers met to discuss the pros and cons of

each candidate and after second interviews were conducted.  (See id. at ¶ 4.)

During the course of those discussions, each applicant's performance review was

examined.  (See id. at ¶¶ 4, 5; see also Josiah Decl. at ¶ 3.)

The team examined Kinsey's April 2004 performance, which review noted

that plaintiff required improvement in the area of acknowledging customers

promptly.[33]  (See Exh. 1 to Pl. Dep. at D0008.)  The same review also noted that

Kinsey "needed to improve" in the following areas: (1) able to lead, set good

example, train others, and get results; (2) maintains good attitude and disposition,

and is cooperative and sincere with employees and customers; and (3) maintains

---

[32] Tompkins did not participate in the initial interviews.  (See Tompkins Decl. at ¶ 4.)

[33] Plaintiff's supervisor noted "I would like to see Cherlyn consistently meet and greet customers at the door.  At times I have noticed a delayed reaction to customers walking into the office.  Don't wait to see if someone else is going to help the customer, try to be the first to the door each and every time."  (Pl. Dep., Exh. 1 at D0008.)

dependability – absenteeism and tardiness.  (See id.)  Plaintiff attached two sheets of her own comments in response to the performance review, noting that "I have to up my game to a level that I can make a lot around Enterprise happen.  That's in doing my job to the best I can.  So yes, I did drop off the charts, and yes I do need to make a better example of myself."  (Id. at D0015.)

Plaintiff *believes* that she was denied the truck leasing position because of her race and gender.  (See Doc. #27 at 32; see also Pl. Dep. at 193, 199.)  She holds this *belief* because:

> I felt he had just been hired on with the company, and the interview – well, the qualification they were asking for is strong – for a strong person to come in and interview.  And in the interview, they came back – the interview came down to myself and Clay's.  I was told by Alan and – well, that I had a better interview overall than all of them, due to the fact when I came into my interview, and they asked questions about how did I know about trucking.  Like I told them, I called different areas of Enterprise that had trucking already established in their company, and I talked to several people in trucking about what trucking was about, what to expect, what to take in, what to do.  And going in with the strong marketing background; that they said was one of the main things that trucking required, you got to have a strong marketing background, you've got to know the marketing, I did all of that.  And I felt like I had a stronger background than him.  Clay had only been with the company for a couple of months, and I am going in as a MA.  I couldn't understand how this, what I wrote saying I wanted to work in other areas of Enterprise and rental, that's like working – that's like working with the people where – that I'm at.  Going into different areas, I felt like trucking was a different area.  I knew I was strong and I could work . . . Trucking is totally different than working in the other branches . . . trucking, you are only dealing with corporate people, corporate offices.  You don't have to deal with the public all of the time . . . I wanted to work in other areas of Enterprise, and I felt like trucking was a totally different area from the rental area.

28

(Pl. Dep. at 202-03.)

**F.     Promotion Decision made by Chad Goodrich/Chuck Carr/Sheila Fondren – The Human Resources Coordinator Position (55MM)**

On June 28, 2004, Enterprise filled an open Human Resources Coordinator position with Cathy Loftin, a white female.  (See Doc. #21, Exh. A at 3.)  Nine individuals applied for the position, and all nine were interviewed on the telephone by Chad Goodrich.  (See id.; see also Exh. 1 to Goodrich Dep.)  Of the applicants, Goodrich selected three for in person interviews.  (See Doc. #21, Exh. A at 3.)  Goodrich testified that he did not select plaintiff for an in-person interview "due to how she answered some of those behavioral questions as far as the situations in place.  I thought some of her – just her philosophy and reasoning was a little abrasive, direct."[34]  (Goodrich Dep. at 28.)  Goodrich contacted plaintiff to inform her that she had not been selected for an in-person interview. He told plaintiff that she had a similar personality to his, and he was looking for someone with a personality "opposite from his."  (Pl. Dep. at 226.)

-----

[34] "She would answer the open-ended question in a way that was not sympathetic to the employee's needs, just rubbing – the way she would answer the question in a real life situation would create some friction between the employee and the HR staff."  (Goodrich Dep. at 28-29.) In contrast, Loftin was sympathetic.  (See id. at 30.)  "She showed organization, she showed that she could process data, and she could direct employees in a way that we could help the employee but also keep our business needs in mind."  (Id.)

Chuck Carr (a white male) and Sheila Fondren (Group HR Manager for Group 55 and a white female) did the final interviews.  (See id.; see also Fondren Decl. at ¶ 1.)  Loftin was selected for "her understanding of the role, her enthusiasm for the job, and her experience doing charity work."[35]  (Doc. #21, Exh. A at 3.)

Plaintiff *believes* that she was denied the Human Resources Coordinator position because of her race.  (See Doc. #27 at 32.)  "The only thing I can say as far as the person that I interviewed with, Chad Goodrich, I felt I had a very good phone interview answering all the questions going into it, but I felt uncomfortable interviewing with Chad Goodrich."  (Pl. Dep. at 215-16.)  Plaintiff felt uncomfortable interviewing with Goodrich because he had stated to her in a previous conversation that he as a white person would be promoted over a black person even if the black person's skills were better.[36]  (See id. at 217, 221.)

## IV. Applicable Substantive Law and Analysis

---

[35] Fondren considered Loftin's experience doing charity work to be particularly important because one of the Human Resources Coordinator's job duties is to oversee the CARE Team (Community Action Representatives of Enterprise).  (See Loftin Decl. at ¶ 2.)

[36] According to plaintiff, she complained about this comment to Vincent Gatlin, assistant in Human Resources.  (See Pl. Dep. at 224.)  Gatlin laughed it off and told plaintiff not to worry about it.  (See id. at 225.)  Plaintiff did not report the comment to anyone in upper management.  (See id. at 226.)

Goodrich denies that he made any such comment.  (See Goodrich Dep. at 38-39.)  However, since there is a dispute in the record on this point, the court will assume, for summary judgment purposes, that the comment was made as alleged.

30

Plaintiff's complaint alleges, as relevant here,[37] that Enterprise discriminated against her by denying her promotions to eight different positions.[38]  (See generally Compl.; see also Doc. #24.)  Defendant's motion (doc. #25) for summary judgment, as amplified in its brief in support thereof, asserts that: (1) all of Kinsey's claims predating March 15, 2004 are time-barred; (2) plaintiff cannot establish a prima facie case of discrimination for all of the challenged positions; (3) the record evidence demonstrates that Kinsey was not denied any promotion because of her race and gender; and (4)[39] even if Kinsey can establish a prima facie case of promotion discrimination, the record evidence demonstrates that Enterprise selected another candidate for legitimate, non-discriminatory reasons. (See Doc. #25 at 1-2.)

**A.   Title VII Discrimination in Failure to Promote (Count I)**

**1.   Timeliness of Title VII Gender and Race Claims[40]**

---

[37] See footnote 9, supra.

[38] At times Kinsey characterizes her race and gender discrimination claims as one ongoing discriminatory pattern.  However, while the overall course of events is certainly relevant, because the McDonnell Douglas approach is designed to focus the court's inquiry on the reasons for a particular decision, the court will analyze separately each of the promotion decisions at issue. See Alexander v. Chattahoochee Valley Comm. College, 325 F. Supp. 2d 1274, 1281 (M.D. Ala. 2004).

[39] See footnote 3, supra.

[40] Defendant's motion for summary judgment as related to the §1981 claims regarding the Gardendale and Trussville positions is discussed infra.

Title 42 U.S.C. § 2000e-5(e)(1) is a charge filing provision that "specifies with precision" the prerequisites that a plaintiff must satisfy before filing suit.  See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109 (2002), quoting Alexander v. Gardner-Denver Co., 415 U.S. 36, 47 (1974)).  "A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred."  42 U.S.C. § 2000e-5(e)(1).  A discrete retaliatory or discriminatory act "occurred" on the day that it "happened."  Morgan, 536 U.S. at 110.  Moreover, "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify.  Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'"  Id. at 114.

Plaintiff filed her charge of discrimination (No. 130-2004-04372) with the EEOC on September 10, 2004, alleging "continuing" discrimination on the basis of her race and gender.  (See Doc. #11.)  However, Title VII bars all discrete acts of discrimination which occurred 180 days prior to September 10, 2004, that date being March 15, 2004.  See Stuart v. Jefferson County Dep't of Human Resources, 152 Fed. Appx. 798, 800-01 (11th Cir. 2005) ("We reject [plaintiff's] contention that his claims are continuing violations.  An employer's failure to promote is a discrete act or single occurrence and therefore the continuing violation doctrine

32

does not apply").  There is no dispute that two of the promotion decisions about which plaintiff complains herein were made in February 2004.  (See Doc. #27 at 32.)  Those decisions were the promotion of John Warnock to the Gardendale position on February 4, 2004 and the promotion of Robert Hallowell to the Trussville position on February 4, 2004.[41]  (See id.)  Therefore, defendant's motion for summary judgment as it relates to the Gardendale and Trussville positions for Title VII failure to promote is due to be granted.

### 2.    Merits of the Title VII Gender Claims

Plaintiff alleges that she was discriminatorily denied three promotions because of her gender in violation of Title VII: (1) the September 1, 2004 Pell City position for which Daniel Spencer was selected; (2) the September 1, 2004 Trussville position for which Scott Craft was selected; and (3) the August 2, 2004 truck leasing management assistant position for which Reid Ten Clay was selected.  (See Doc. #27 at 32; see also generally Compl. and Section IV.A.1 above.)

---

[41] The decision to promote John Bailey to downtown assistant manager was made in October 2003.  Plaintiff has conceded that Enterprise is entitled to summary judgment with respect to this position on all counts.  (See Doc. #27 at 3.)

To establish gender discrimination in a failure to promote case using circumstantial evidence,[42] the plaintiff must show: (1) that she belongs to a protected class; (2) that she applied for and was qualified for the position for which the employer was seeking applicants; (3) that she was denied the promotion; and (4) that another equally or less qualified individual outside of the protected class received the promotion or that the position remained open.  See Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 768 (11th Cir. 2005); see also Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1089 (11th Cir. 2004).  After the plaintiff has produced evidence sufficient to establish her prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the failure to promote.  See Vessels, 408 F.3d at 767; see also Carter v. Three Springs Residential Treatment, 132 F.3d 635, 642-43 (11th Cir. 1998).  Upon articulation, the burden shifts back to the plaintiff to prove that the articulated reason acted as a pretext for discrimination.  See id. at 643; see also McDonnell Douglas v. Green, 411 U.S. 792, 802-03 (1973).  One method of proving pretext is showing that the employer's proffered explanation is unworthy of credence.  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 517 (1993).  It is upon this method of proving pretext that plaintiff relies.  (See Doc. #27 at 33-34.)  However, "a

---

[42] Plaintiff admits that this is a circumstantial evidence case.  (See Doc. #27 at 30.)

reason is not pretext for discrimination 'unless it is shown *both* that the reason is false, *and* that discrimination was the real reason.'" <u>Milledge v. Rayonier, Inc.</u>, 192 Fed. Appx. 863, 865 (11th Cir. 2006), <u>quoting</u> <u>St. Mary's Honor Center</u>, 509 U.S. at 515.  Moreover, where qualification is at issue, "a plaintiff cannot prove pretext by simply arguing or even by showing that [s]he was better qualified than the [individual] who received the position [s]he coveted.  A plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by [gender].  We have explained, a plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reasons, at least not where the reason is one that might motivate a reasonable employer." <u>Alexander v. Fulton County</u>, 207 F.3d 1303, 1339 (11th Cir. 2000) (internal quotations omitted).

For purposes of summary judgment, the court assumes that plaintiff has established a prima facie case of gender discrimination for the three positions at issue here.  (<u>See</u> Doc. #27 at 32; <u>see</u> <u>also</u> Doc. #26 at 19.)

### a.    The September 2004 Pell City Position

Enterprise articulates that Daniel Spencer was selected for the September 2004 Pell City position because he had a great sales plan and grew up in Pell City. (<u>See</u> Doc. #21, Exh. A at 3.)  The Promotion Flow Log indicates that Kinsey was

not selected for the position because "negative attitude perception by Matt and Van not overcome."  (See Doc. #28, Exh. R at D0136.)  In his deposition, Mike Brady  testified that Kinsey was "beaten in the interview."  (Brady Dep. at 23-24.) "Daniel for 1P had just some great ideas for sales and how to grow the branch, and at the time that was the specific thing I was looking for an assistant manager at that branch."  (Id. at 24.)  These are legitimate, non-discriminatory reasons to select Spencer over Kinsey for the promotion.  The subjectivity of articulated reasons does not make them any less legitimate.

> Subjective evaluations of a job candidate are often critical to the decisionmaking process, and if anything, are becoming more so in our increasingly service-oriented economy.  Take, for example, a job requiring continued interaction with the public, such as a sales clerk or wait staff position.  Attitude, articulateness, and enthusiasm, as well as appearance, can be vitally important in a job, yet there are few if any ways to gauge such qualities objectively or from a written application. Interviews give prospective employers a chance to see if an applicant has the kind of personal qualities a service job requires and can be the best way an employer has to determine how a person interacts with others . . . Personal qualities also factor heavily into employment decisions concerning supervisory or professional positions.

Chapman, 229 F.3d at 1033-35.  Thus, the presumption of discrimination is eliminated, thereby shifting the burden to Kinsey to come forward with sufficient evidence to permit a reasonable fact-finder to find that the articulated reasons are pretextual.  See Chapman, 229 F.3d at 1028.  Counsel for plaintiff has the following theories on pretext: (1) Enterprise was inconsistent in articulating the factors considered in making promotion decisions; (2) Enterprise manipulated the

matrix system; (3) Enterprise offered inconsistent explanations for not promoting Kinsey to the Pell City position; and (4) Enterprise did not rely on candidates' plans.  (See Doc. #27 at 33-46.)  Plaintiff herself adds that Morrison told her he felt like she had gotten a raw deal and plaintiff had been with the company longer than Spencer at the time the decision was made.  (See Pl. Dep. at 139-40, 168-69.)

Plaintiff's pretext argument 1 as outlined above is premised on the fact that the position statement provided by counsel for defendant to the EEOC is inconsistent with decisionmakers' testimony.  (See Doc. #27 at 34-35.)  Indeed the position statement clearly asserts that "after applying the matrix to decide who will get an interview, [Enterprise] makes promotion decisions based *solely* on the interviewees' interviewing skills."  (Id.)  In contrast, various decisionmakers testified that, in addition to interview skills, they considered factors such as work attitude, prior work performance, performance evaluations, experience, recommendations from area managers, and even matrix scores in deciding who would be awarded the position.  (See, e.g., Brady Dep. at 37-38; Richardson Dep. at 33; Bell Dep. at 56; Pl. Dep. at 149.)

The EEOC position statement is not evidence in this case and cannot be used to create an issue of fact.  See Bowden v. Wal-Mart Stores, Inc., 124 F. Supp.2d 1228, 1236 (M.D. Ala. 2000) (pleadings are not evidence).  Pleadings are

not evidence in part because they are written by retained counsel.  There is no evidence that the EEOC position statement, signed by counsel of record Fern Singer, was ever reviewed by anyone at Enterprise.  See also Chapman, 229 F.3d at 1038 (where position statement, prepared by employee of defendant and reviewed by decisionmaker, was redacted at trial, such redaction was harmless error).  Moreover, to the extent plaintiff is arguing pretext in that different decisionmakers considered different factors in making promotion decisions, (see doc. #27 at 34-35), that argument is also without merit.  See Chapman, 229 F.3d at 1031, n.21 ("Different decisionmakers are entitled to be concerned about different things"); see also Bassano v. Hellman Worldwide Logistics, Inc., 310 F. Supp.2d 1270, 1280 (N.D. Ga. 2003).

Pretext argument 2 as outlined above is wholly inapplicable to the September 2004 Pell City position.  The evidence in this case undisputedly shows that plaintiff was interviewed for the position.  (See Doc. #21, Exh. A at 3; see also Exh. 1 to Brady Dep. at D0121, D0136.)  Thus, even making the giant assumption that the matrix was manipulated, it was manipulated to *favor* the plaintiff, not to discriminate against her.

As her third pretext argument, plaintiff offers:

> On the Promotion Flow Log, the reason given for not selecting
> Kinsey was an unspecified concern about Kinsey's attitude.
> However, in his deposition, Brady testified that "attitude" was not the
> reason why Kinsey was not selected.  Rather, he said it was because
> her ideas were not as good.  Brady further testified that Kinsey's
> "attitude" was not a factor that he believed should have prevented
> Kinsey from being promoted to the position.  Moreover, Brady
> testified that Kinsey was "beaten in the interview" but this contention
> is not reflected on the Promotion Flow Log.  On the promotion flow
> log, only unspecified concerns regarding her attitude are stated.
> Brady also testified that Kinsey had "no enthusiasm" and she did not
> specifically "ask for the job."  Again, neither of these reasons are
> described in any way on the Promotion Flow Log.

(Doc. #27 at 42) (internal citations omitted).  However, upon careful review of the

cited deposition testimony, it is clear that these are not shifting articulations.

Brady testified that what caused *him* to decide Kinsey was not right for the

promotion was that she was "beaten" in the interview.  (See Brady Dep. at 24.)

Brady himself did not feel that Kinsey's attitude was something that should have

prevented her from getting the job.  (See id. at 23-24.)  In contrast, the feedback

that Brady noted on the Promotion Flow Log was the other decisionmakers'

reason for not selecting Kinsey for the position.  (See id. at 20.)  Brady's

additional deposition testimony merely expounds on how Kinsey was "beaten" in

the interview.  (See Brady Dep. at 22-24.)

Moreover, it is not inappropriate for an employer to have multiple

legitimate, non-discriminatory reasons for choosing one candidate over another.

39

(See Doc. #27 at 42.)  Instead when an employer has several articulated reasons for its decision, it is the job of plaintiff in demonstrating pretext to rebut each articulated legitimate non-discriminatory reason head-on.  See Alexander v. Fulton County, Ga., 207 F.3d 1303, 1341 (11th Cir. 2000).  Rather than doing so, plaintiff has effectively done nothing more than quarrel with the wisdom of Enterprise's articulated reasons.[43]  See id. at 1341.

Pretext argument 4 as outlined above is wholly inapplicable to the instant position.  It is undisputed that although Brady generally threw away plans candidates presented to him during interviews, Spencer actually and successfully implemented his plan once he became ABM of Pell City.  (See Brady Dep. at 28.)  Thus, plaintiff's argument that "it is reasonable to infer that such plans were entirely unimportant and could not be the true reason for the promotion decision" is wholly without merit with regard to the September 2004 Pell City position.

Finally, plaintiff's theories on pretext fail to establish that Enterprise's articulated legitimate, non-discriminatory reasons are unworthy of credence.  First, the comment attributed to Morrison solidifies the contention that plaintiff was

---

[43] Plaintiff baldly asserts "I've been with the company longer than him and I knew more than Daniel.  I was stronger than Daniel going in." (Pl. Dep. at 168-69.)  She does not dispute that she was "beaten" in the interview, does not dispute that she failed to overcome the perception of her negative attitude, does not dispute that Spencer had a great plan for the branch, and does not dispute that Spencer grew up in Pell City.

questioned about her attitude during the interview.  It does nothing to establish that plaintiff was denied the position because of her gender, even if she didn't get a "fair chance" in the interview.  Further, her theory of seniority does nothing more than quarrel with the wisdom of Enterprise's reasons for selecting Spencer over Kinsey.  See Pettway v. Am. Cast Iron Pipe Co., 494 F.2d 211, 246 n. 92 (5th Cir. 1974) ("For, after all, seniority is necessarily an inefficient means of assuring sufficient prior job experience").

Plaintiff has simply failed to come forward with sufficient evidence to permit a fact-finder to find that at least one of the articulated reasons were pretextual.  Because it is not the court's role to second-guess the wisdom of an employer's decisions as long as the decisions are not gender motivated, defendant's motion for summary judgment as to plaintiff's claim that she was discriminatorily denied the Pell City position because of her gender in violation of Title VII is due to be granted.

### b.      The September 2004 Trussville Position

Enterprise articulates that Scott Craft was selected for the September 2004 Trussville position because "Craft had the best interview because he articulated a plan to improve branch performance with examples."  (Doc. #21, Exh. A at 3; see also Brady Dep. at 35-36.)  According to Brady, Kinsey was again beaten in the

41

interview.  "She had no real plans for CDW [collision damage waiver] and growth [of the office], and those were two areas that I was interested in."  (Id. at 36; see also Doc. #28, Exh. X at D0113.)  Enterprise's offer of these legitimate, non-discriminatory reasons[44] eliminates the presumption of discrimination, thereby shifting the burden to Kinsey to come forward with sufficient evidence to permit a reasonable fact-finder to find that at least one of those reasons was pretextual.  See Chapman, 229 F.3d at 1028.

Counsel for plaintiff has the following theories on pretext: (1) Enterprise was inconsistent in articulating the factors considered in making promotion decisions; (2) Enterprise manipulated the matrix system; and (3) Enterprise did not rely on candidates' plans.  (See Doc. #27 at 33-46.)  Plaintiff herself adds: "Craft is a white guy, and as far as that, my numbers, looking at the numbers that – the paper that you-all sent to my attorney, I had better numbers than him.  And, like I say, I had been at the company longer than him, so I really knew the position."  (Pl. Dep. at 171-73.)

Pretext argument 1 as outlined above fails for the same reasons it did in Section IV.A.2.a.  Not only is the EEOC position statement not evidence in this case, but different decisionmakers are entitled to be concerned about different

_____

[44] See discussion on subjective factors, Section IV.A.2.a, supra.

things.  See Bowden, 124 F. Supp.2d at 1236 and Chapman, 229 F.3d at 1031,

n.21.  Pretext argument 3 also fails.  There is simply no evidence from which a

reasonable inference can be made that "plans were entirely unimportant and could

not be the true reason for the promotion decision" when the interviewers threw

away plans after the interview.  There is absolutely no evidence that Craft did not

implement his plans as represented during the interview.

Plaintiff's second pretext argument is the heart of her dispute with the

decision to promote Craft over herself to the September Trussville position.  She

argues that Enterprise's use and application of the matrix is inconsistent and

manipulated to favor whites and males.  (See Doc. #27 at 37-38.)  Specifically, she

argues that Craft should never have been interviewed for the September Trussville

position because he was number eight on the matrix, falling below a "natural

break."  (See Doc. #27 at 40; see also Brady Dep. at 14, 31.)

While it is undisputed that Craft did fall below the "tie or natural break" on

the management matrix for the September Trussville position, it is also undisputed

that he was interviewed "because there were two positions available[45] and we

_____

[45] "At the time there were two positions opened, 1P and 1T, so we had individuals who
were not interested in the Pell City position, only for the Trussville position, and then individuals
that were interested in both."  (Brady Dep. at 33.)  Craft had expressed interest in both of the
open positions.  (See id. at 34.)

basically took the top five for both positions, which came out to be eight people and only . . . two people matrixed out." (Brady Dep. at 33; <u>see</u> <u>also</u> Exh. 1 to Brady Dep. at D0112.)  Had the company issued only one management matrix for both the Pell City and Trussville positions, Craft would have been matrixed out. (<u>See</u> <u>id.</u> at 33-34.)

Undisputedly, Craft ranked number five on the management matrix for the Pell City position and number eight on the management matrix for the Trussville position.  (<u>See</u> Exh. 1 to Brady Dep. at D0121.)  It is also undisputed that Enterprise interviewed the top five individuals ranking on the Pell City matrix *and* the top five individuals ranking on the Trussville matrix.[46]  (<u>See</u> Brady Dep. at 33.) Therefore, nothing was manipulated in order that Craft be interviewed for the

---

[46] That is, the following individuals were interviewed: Travis Agee; Shaun Mazur; Cherlyn Kinsey; Shaun Reed; RJ Williams; Daniel Spencer; and Scott Craft.  These were the seven individuals who ranked in the top five of the two separate management matrixes.

positions.[47]  He made it on the management matrix fair and square and had

indicated that he was interested in both positions.

Because Kinsey has failed to demonstrate that Enterprise's proffered

explanations are unworthy of credence by the methods outlined above, she must

rebut head-on the articulated reasons for selecting Craft to the September

Trussville position.  She has wholly failed to do so.  She has not brought forth

evidence that she had plans for growing the Trussville branch or implementing

collision damage waiver.  She has not brought forth evidence that she overcame

the perception of her negative attitude during the interview.  Instead, she states

only that she *believes* her gender factored into the decision because "Craft is a

white guy, and as far as that . . . I had better numbers than him . . . I had been at

---

[47] Plaintiff argues pretext on the ground that the matrix was manipulated in favor of males because Ben Mitchell, a male, was also interviewed for both positions while Beth Parsons, a female, was not.  (See Doc. #27 at 40.)  First, to support this argument, plaintiff makes much of the fact that Beth Parsons was not interviewed, despite the fact that she ranked higher than Craft on the Trussville matrix.  (See Doc. #27 at 40; see also Exh. 1 to Brady Dep. at D0111.)  This argument completely ignores the undisputed fact that Craft ranked fifth on the Pell City matrix and Enterprise interviewed the top five individuals ranking on the Pell City matrix *and* the top five individuals ranking on the Trussville matrix.  (See Brady Dep. at 33-34, 43.)  Second, to support her pretext argument, plaintiff argues that Ben Mitchell should not have been interviewed for the position because "he was ranked number seven on the Trussville matrix, did not interview for the Pell City promotion, and was not even listed on the Pell City matrix."  (Doc. #27 at 40.)  This argument completely ignores the undisputed fact that going into the interview, Enterprise was led to believe that Mitchell was interviewing for both positions.  (See Brady Dep. at 40.)

All of this is window dressing because Kinsey *was* interviewed for the position and plaintiff has admitted that the matrix rankings are not influenced in any way by race and/or gender.  (See Pl. Dep. at 58, 61, 63-64.)

the company longer than him, so I really knew the position." Thus, plaintiff has done nothing more than quarrel with the wisdom of Enterprise's articulated reasons. See id. at 1341.

It is not the court's role to second-guess the wisdom of an employer's decisions as long as the decisions are not gender motivated. Therefore, defendant's motion for summary judgment as to plaintiff's claim that she was discriminatorily denied the September Trussville position because of her gender in violation of Title VII is due to be granted.

### c.   The August 2004 Truck Leasing Position

Enterprise articulates that Reid Ten Clay was selected for the truck leasing position because he had a positive attitude, was outgoing, sold himself, and asked for the job. (See Doc. #21, Exh. A at 3.) Enterprise has not alleged that Clay was hired because he was more qualified for the job than Kinsey. (See id.) In contrast, plaintiff was not chosen for the position because of comments she had written on her April 2004 performance evaluation. (See Exh. 1 to Pl. Dep. at D0015.) Enterprise's offer of these legitimate, non-discriminatory reasons[48] eliminates the presumption of discrimination, thereby shifting the burden to Kinsey to come

---

[48] See discussion on subjective factors, Section IV.A.2.a, supra.

forward with sufficient evidence to permit a reasonable fact-finder to find that those reasons were pretextual.  See Chapman, 229 F.3d at 1028.

Plaintiff argues pretext [49] on the ground that "qualifications evidence may suffice in at least some circumstances, to show pretext." [50]  (Doc. #27 at 44.)  However, this assertion of pretext does nothing more than argue that plaintiff was the superior candidate for the truck leasing position. [51]  Plaintiff does not rebut Enterprise's articulated reasons for choosing Clay for the position.  See Ash v.

_____

[49] Additional grounds for pretext included in plaintiff's brief are not applicable to the truck leasing position since no matrix was created for this position (and there is no evidence to support the claim that this was against company policy) and Enterprise did not articulate that it chose Clay for the position because of his plans for that position.  Moreover, as discussed earlier, "different decision makers are entitled to be concerned about different things."  Chapman, 229 F.3d at 1031, n.21.  Therefore, although Tompkins, Josiah, and Mundy reviewed Kinsey's personnel file and evaluations whereas other decision makers did not typically make such a review, that argument is also without merit.  (See Doc. #27 at 27.)

[50] In support of her qualifications argument, plaintiff states:

> When Clay was promoted to the Truck Leasing Management Assistant, Clay did not even have the minimum qualifications to interview for the position, much less be promoted to the position, because he was not a Management Assistant.  When he was promoted, he was a Trainee who had only worked for the company approximately three months.  He had not yet had his first 90-Day Review, and he had not passed his "grills" to qualify as a Management Assistant.  At that time, Kinsey had worked successfully for the company over two years, passed her "grills," performed many of the duties of an Assistant Branch Manager, and had been recommended for a promotion by her branch manager in her review.

(Doc. #27 at 44.)

[51] Moreover, Kinsey has not met her burden under Cooper to show that the disparities between her qualifications and those of Clay were "of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question."  Cooper, 390 F.3d at 732.

47

Tyson Foods, Inc., 190 Fed. Appx. 924, 927 (11th Cir. 2006) (citing Brooks v.

County Commission of Jefferson County, Ala., 446 F.3d 1160 (11th Cir. 2006);

Watkins v. City of Huntsville, 176 Fed. Appx. 955 (11th Cir. 2006); Roper v. City

of Foley Police Dept., 177 Fed. Appx. 40 (11th Cir. 2006); and Price v. M&H

Valve Co., 177 Fed. Appx. 1 (11th Cir. 2006).

Because it is not the court's role to second-guess the wisdom of an

employer's decisions as long as the decisions are not gender motivated,

defendant's motion for summary judgment as it relates to plaintiff's Title VII

gender discrimination claim for the truck leasing position is due to be granted.

### B.    Title VII and 42 U.S.C. § 1981 Race Discrimination in Failure to Promote (Count II)

Plaintiff alleges that she was discriminatorily denied five positions because

of her race in violation of Title VII and 42 U.S.C. § 1981: (1) the February 4, 2004

Gardendale position for which John Warnock was selected;[52] (2) the April 4, 2004

Southern Company branch position for which Kara Dehart was selected; (3) the

February 4, 2004 Trussville position for which Robert Hallowell was selected;[53]

(4) the June 15, 2004 Tom Williams position for which Christy White was

---

[52] Plaintiff's only remaining claim with regard to this position is under 42 U.S.C. § 1981. See Section IV.A.1, supra.

[53] Plaintiff's only remaining claim with regard to this position is under 42 U.S.C. § 1981. See Section IV.A.1, supra.

selected; (5) the September 1, 2004 Trussville position for which Scott Craft was selected; (6) the August 2, 2004 truck leasing management position for which Reid Ten Clay was selected; and (7) the June 28, 2004 Human Resources Coordinator position for which Cathy Loftin was selected.  (See Doc. #27 at 32; see also generally Compl.)

The Eleventh Circuit applies the same analytical framework to Title VII and § 1981 race discrimination claims.  See Hudson v. Mr. Burch Formal Wear, Inc., 2006 WL 2351837, No. 05-16269, at *1 (11th Cir. Aug. 15, 2006), citing Cooper v. Southern Co., 390 F.3d 695, 724-25 (11th Cir. 2004)).  To establish discrimination in a failure to promote case using circumstantial evidence, the plaintiff must show: (1) that she belongs to a protected class; (2) that she applied for and was qualified for the position for which the employer was seeking applicants; (3) that she was denied the promotion; and (4) that another equally or less qualified individual outside of the protected class received the promotion or that the position remained open.  See Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 768 (11th Cir. 2005); see also Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1089 (11th Cir. 2004). After the plaintiff has produced evidence sufficient to establish her prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the failure to promote.  See Vessels, 408 F.3d at 767; see

also Carter v. Three Springs Residential Treatment, 132 F.3d 635, 642-43 (11th

Cir. 1998).  Upon articulation, the burden shifts back to the plaintiff to prove that

the articulated reason acted as a pretext for discrimination.  See id. at 643; see also

McDonnell Douglas v. Green, 411 U.S. 792, 802-03 (1973).

For purposes of summary judgment, the court assumes that plaintiff has

established a prima facie case of race discrimination for the seven positions at

issue here.

### 1.    The Gardendale Position[54]

Enterprise articulates that Warnock was chosen for the position because he

had the best interview, the best performance, and had a good action plan for the

Gardendale location.  (See Richardson Dep. at 31.)  Warnock brought with him to

the interview "a packet and a very detailed plan on what he was going to do with

the store when he got there as an assistant manager."  (Id.)  Enterprise's offer of

these legitimate, non-discriminatory reasons[55] eliminates the presumption of

discrimination, thereby shifting the burden to Kinsey to come forward with

sufficient evidence to permit a reasonable fact-finder to find that those reasons

were pretextual.

---

[54] See footnote 52, supra.

[55] See discussion on subjective factors, Section IV.A.2.a, supra.

50

Counsel for plaintiff provides the following theories on pretext: (1) Enterprise was inconsistent in articulating the factors considered in making promotion decisions; (2) Enterprise manipulated the matrix system; (3) Enterprise did not rely on candidates' plans as articulated; and (4) Warnock was on probation because of his driving record at the time of his promotion.  (See Doc. #27 at 15, 34-43.)  Plaintiff herself testified that race played a role in the decisionmaking process because "he's a white male and I'm a black female . . .I've been with the company longer, I knew the skills, I knew how to run that branch.  He would ask me to come over and work that branch for him when he didn't have people there, so I acted as an assistant manager then.  So coming in, when I went into that interview, I felt like I had a stronger background than John Warnock did."  (Pl. Dep. at 154.)

Pretext argument 1 as outlined above fails for the same reasons it did in Section IV.A.2.a above.  Not only is the EEOC position statement prepared by counsel for defendant not evidence in this case, but different decision makers are entitled to be concerned about different things.  See Bowden, 124 F. Supp.2d at 1236 and Chapman, 229 F.3d at 1031, n.21.  Pretext argument 2 fails for a more fundamental reason than did the first – the top five applicants as ranked on the matrix were interviewed for the position – no more and no less.  Thus, the

51

decisionmakers exercised no discretion in deciding whom to interview and no argument of manipulation can be crafted.[56]  Finally, pretext argument 3 also fails. No reasonable inference can be made that "plans were entirely unimportant and could not be the true reason for the promotion decision" simply because the written plans were not kept following the interview.  Moreover, there is absolutely no evidence that Warnock did not implement his plans as represented during the interview.  (See generally Pl. Dep. and Richardson Dep.)

Warnock's driving record and plaintiff's own testimony regarding her "evidence" of pretext does nothing more than quarrel with the wisdom of Enterprise's articulated reasons for selecting Warnock over Kinsey.  See Alexander, 207 F.3d at 1341.  Because it is not the court's role to second-guess the wisdom of an employer's decisions so long as the decisions are not racially motivated, defendant's motion for summary judgment as to plaintiff's claim that she was discriminatorily denied the Gardendale position because of her race in violation of 42 U.S.C. § 1981 is due to be granted.

## 2.    The Southern Company Position

---

[56] Moreover, plaintiff herself testified that matrix rankings are not affected in any way by race and/or gender.  (See Pl. Dep. at 58, 61, 63-64.)

Enterprise articulates that Dehart was chosen for the Southern Company position because she had an excellent interview, a strong action plan, understood the operation at the satellite office, was a top performer, and was always highly recommended.  (See Richardson Dep. at 38.)  Enterprise's offer of these legitimate, non-discriminatory reasons[57] eliminates the presumption of discrimination, thereby shifting the burden to Kinsey to come forward with sufficient evidence to permit a reasonable fact-finder to find that those reasons were pretextual.

Counsel for plaintiff provides the following theories on pretext: (1) Enterprise was inconsistent in articulating the factors considered in making promotion decisions; (2) Enterprise manipulated the matrix system; (3) Enterprise did not rely on candidates' plans as articulated; and (4) Dehart had been with Enterprise two and a half months less than Kinsey.  (See Doc. #27 at 34-43.) Plaintiff's testimony supporting her race discrimination claim is: "She's [Dehart's] a white female and I had a stronger background than her.  I had been with the company longer than her . . . I had better – stronger skills than her.  I prepared myself for that interview."  (Pl. Dep. at 122, 157.)

---

[57] See discussion on subjective factors, Section IV.A.2.a, supra.

53

Pretext argument 1 as outlined above fails for the same reasons it did in Section IV.A.2.a above.  Not only is the EEOC position statement prepared by counsel for defendant not evidence in this case, but different decision makers are entitled to be concerned about different things.  See Bowden, 124 F. Supp.2d at 1236 and Chapman, 229 F.3d at 1031, n.21.  Pretext argument 2 fails because, even making the giant assumption that the matrix was manipulated, plaintiff testified that she *was* interviewed for the position.[58]  Thus, the matrix, if manipulated, was manipulated to *favor* the plaintiff, not discriminate against her. Pretext argument 3 also fails.  No reasonable inference can be made that "plans were entirely unimportant and could not be the true reason for the promotion decision" simply because the written plans were not kept following the interview. Moreover, there is absolutely no evidence that Dehart did not implement her plans as represented during the interview.  (See generally Pl. Dep. and Richardson Dep.) Finally, pretext argument 4 fails.  To the extent that plaintiff is arguing that the term "experience" is synonymous with the term "seniority," (and Kinsey's managers told her that "experience" plays an important role in obtaining promotions but then promoted less senior co-workers to Kinsey's desired position), that argument is clearly without merit.  It is, of course, possible to have

---

[58] As this is a disputed fact in the record, the court takes plaintiff's version as true.

experience without seniority and vice versa.  See, e.g., Pettway v. Am. Cast Iron Pipe Co., 494 F.2d 211, 246 n. 92 (5th Cir. 1974) ("For, after all, seniority is necessarily an inefficient means of assuming sufficient prior work experience").

Plaintiff's own testimony regarding her "evidence" of pretext does nothing more than quarrel with the wisdom of Enterprise's articulated reasons for selecting Dehart over Kinsey.  See Alexander, 207 F.3d at 1341.  Because it is not the court's role to second-guess the wisdom of an employer's decisions so long as the decisions are not racially motivated, defendant's motion for summary judgment as to plaintiff's claim that she was discriminatorily denied the Southern Company position because of her race in violation of Title VII and 42 U.S.C. § 1981 is due to be granted.

### 3.   The February Trussville Position[59]

Enterprise articulates that Hallowell was selected for the February Trussville position because he presented a great plan for the branch.  (See Exh. 1 to Brady Dep. at D0109.)  Enterprise's offer of this legitimate, non-discriminatory reason[60] eliminates the presumption of discrimination, thereby shifting the burden

---

[59] See footnote 53, supra.

[60] See discussion on subjective factors, Section IV.A.2.a, supra.

to Kinsey to come forward with sufficient evidence to permit a reasonable fact-finder to find that those reasons were pretextual.

Counsel for plaintiff provides the following theories on pretext: (1) Enterprise was inconsistent in articulating the factors considered in making promotion decisions; (2) Enterprise manipulated the matrix system; (3) Enterprise did not rely on candidates' plans as articulated; and (4) Hallowell had been with Enterprise nine months less than Kinsey.  (See Doc. #27 at 21, 34-43.)  Plaintiff adds that Hallowell is white and she is black.  (See Pl. Dep. at 164.)

Pretext argument 1 as outlined above fails for the same reasons it did in Section IV.A.2.a above.  Pretext argument 2 fails once again because, even making the giant assumption that the matrix was manipulated, plaintiff testified that she *was* interviewed for the position.[61]  Thus, the matrix, if manipulated, was manipulated to *favor* the plaintiff, not discriminate against her.  Pretext argument 3 fails.  No reasonable inference can be made that "plans were entirely unimportant and could not be the true reason for the promotion decision" simply because the written plans were not kept following the interview.  There is absolutely no evidence that Hallowell did not implement his plans as represented during the

---

[61] As this is a disputed fact in the record, the court takes plaintiff's version as true.  (See Pl. Dep. at 126-27.)

interview.  (See generally Pl. Dep. and Brady Dep.)  Finally, pretext argument 4

fails.  To the extent that plaintiff is arguing that the term "experience" is

synonymous with the term "seniority," (and Kinsey's managers told her that

"experience" plays an important role in obtaining promotions but then promoted

less senior co-workers to Kinsey's desired position), that argument is clearly

without merit.  It is, of course, possible to have experience without seniority and

vice versa.  See, e.g., Pettway, 494 F.2d at 246 n. 92 (5th Cir. 1974).

The court's rejection of plaintiff's pretext argument on the issue of racial

discrimination with regard to the February Trussville position requires no

discussion.  Because plaintiff has failed to demonstrate pretext, defendant's

motion for summary judgment as to plaintiff's 42 U.S.C. § 1981 claim for the

February Trussville position is due to be granted.

## 4.    The Tom Williams Position

Enterprise articulates that White was chosen for the Tom Williams position

because she had the best interview and the best game plan of what she would do to

improve numbers at the branch.  (See Brady Dep. at 57.)  Enterprise's offer of

these legitimate, non-discriminatory reasons[62] eliminates the presumption of

discrimination, thereby shifting the burden to Kinsey to come forward with

---

[62] See discussion on subjective factors, Section IV.A.2.a, supra.

57

sufficient evidence to permit a reasonable fact-finder to find that those reasons were pretextual.

Counsel for plaintiff provides the following theories on pretext: (1) Enterprise was inconsistent in articulating the factors considered in making promotion decisions; (2) Enterprise manipulated the matrix system; (3) Enterprise did not rely on candidates' plans as articulated; (4) at the time of the promotion, White had been with Enterprise eight months less than Kinsey.  (See Doc. #27 at 21, 34-43.)  Plaintiff offers that race was a factor in the decision because White "was chosen over me and I was stronger than her.  My background was stronger than Christy's."  (Pl. Dep. at 188.)

Pretext argument 1 as outlined above fails for the same reasons it did in Section IV.A.2.a above.  Pretext argument 3 fails for the same reason it failed for the Gardendale, Southern Company, and Trussville positions.  Plaintiff's testimony of her own "evidence" of race discrimination fails, once again, because it does nothing more than quarrel with the wisdom of Enterprise's articulated reasons.  See Alexander, 207 F.3d at 1341.  Pretext argument 4 also fails.  To the extent that plaintiff is arguing that the term "experience" is synonymous with the term "seniority," (and Kinsey's managers told her that "experience" plays an important role in obtaining promotions but then promoted less senior co-workers

58

to Kinsey's desired position), that argument is clearly without merit. It is, of course, possible to have experience without seniority and vice versa. See, e.g., Pettway, 494 F.2d at 246 n. 92 (5th Cir. 1974).

The court is left, then, with the manipulation of the matrix argument. That argument presumably is based on the theory that although Brady had discretion to interview the seventh ranked applicant, he failed to do so because of racial motivations. This argument, overshadowed by the fact that Kinsey testified Brady did not take any action against her because of her race, fails. Mike Brady was the only decisionmaker for the Tom Williams position. (See Doc. #21, Exh. A at 1.) He clearly testified that, in accordance with what he believed to be company policy at the time, he only interviewed the top five candidates on the matrix, unless there was a tie or natural break, or, unless he was interviewing for more than one position. (See Brady Dep. at 14-15, 33.) Plaintiff ranked sixth on the matrix. (See Exh. 1 to Brady Dep. at D0134.) And even assuming Brady *knew* he could reach down and interview Kinsey at his discretion, there is no evidence that he failed to do so because of Kinsey's race.

Therefore, summary judgment is due to be granted on defendant's motion for summary judgment as it relates to plaintiff's Title VII and § 1981 race discrimination claims for the Tom Williams position.

59

### 5.    The September Trussville Position

As noted above, plaintiff is faced with the same burden in establishing her Title VII and § 1981 race claims as she faced in establishing her Title VII gender discrimination claim.  Her pretext arguments fail here for the same reasons they did in Section IV.A.2.b above.  Therefore, summary judgment is due to be granted on defendant's motion for summary judgment as it relates to plaintiff's Title VII and § 1981 race discrimination claims for the September 2004 Trussville position.

### 6.    The Truck Leasing Position

As noted above, plaintiff is faced with the same burden in establishing her Title VII and § 1981 race claims as she faced in establishing her Title VII gender discrimination claim.  Her pretext arguments fail here for the same reasons they did in Section IV.A.2.c above.  Therefore, summary judgment is due to be granted on defendant's motion for summary judgment as it relates to plaintiff's Title VII and § 1981 race discrimination claims for the truck leasing position.

### 7.    The Human Resources Coordinator Position

As discussed in Section III.F. above, Kinsey is pursuing a Title VII/§1981 race claim associated with the June 28, 2004 decision selecting Cathy Loftin for the Human Resources Coordinator position.  Enterprise articulates that Kinsey was not chosen for an in-person interview because of her abrasive and direct reasoning

in answering behavioral questions during the telephone interview.  (See Goodrich Dep. at 28.)  Enterprise's offer of this legitimate, non-discriminatory reason[63] for not choosing plaintiff for an in-person interview eliminates the presumption of discrimination, thereby shifting the burden to Kinsey to come forward with sufficient evidence to permit a reasonable fact-finder to find that those reasons were pretextual.

Plaintiff asserts that Enterprise's articulated reasons are pretextual because: (1) Enterprise was inconsistent in articulating the factors considered in making promotion decisions; (2) Enterprise manipulated the matrix system; (3) Enterprise did not rely on candidates' plans as articulated; and (4) Goodrich's comments are evidence of pretext.  (See Doc. #27 at 34-46.)  Plaintiff herself *believes* that race was a factor in the decision because Goodrich, the person in charge of the telephone interviews, had stated to her that a white person would be promoted faster than a black person, even if the black person had better skills than the white person.[64]  (See Pl. Dep. at 217, 221.)

---

[63] See discussion on subjective factors, Section IV.A.2.a, supra.

[64] Goodrich denies that he made any such comment.  (See Goodrich Dep. at 38-39.) However, since there is a dispute in the record on this point, the court will assume, for summary judgment purposes, that the comment was made as alleged.

61

Pretext argument 1 as outlined above fails for the same reasons it did in Section IV.A.2.a above.  Pretext argument 2 fails because no management matrix was created for this position.  Pretext argument 3 fails for the same reason it failed for the Gardendale, Southern Company, Trussville, and Tom Williams positions. The court, then, is left with Goodrich's comment about whites being promoted faster than blacks as evidence of pretext.

As explained in the fact section, Goodrich was in charge of conducting telephone interviews for all nine applicants for the Human Resources Coordinator position.  Of the applicants, five were white and three were black.[65]  (See Exh. 1 to Goodrich Dep. at D0119.)  Goodrich selected two whites and one black for in-person interviews.  (See Doc. #21, Exh. A at 3.)  He did not select Kinsey, and, as a result, Kinsey was not allowed to interview in person for the Human Resources Coordinator position.  Although Goodrich articulates that Kinsey answered the behavioral questions abrasively, a question for the jury remains as to whether his articulated reason was a pretext for discrimination in light of the comment plaintiff attributes to him.  Therefore, defendant's motion for summary judgment as it relates to the human resources coordinator position is due to be denied.

---

[65] There is no evidence in the record regarding the race of Deanna Stallworth.  (See, e.g., Exh. 1 to Goodrich Dep. at D0119.)

**V.      Conclusion**

For the reasons asserted above, Defendant Enterprise Leasing Company South-Central , Inc.'s First Motion (doc. #25) for Summary Judgment is due to be denied as to the Title VII/§1981 claims related to the Human Resources Coordinator position but is due to be granted as to all other claims addressed in this Memorandum Opinion.[66]

A separate order will be entered.

**DONE** this the ___15th___ day of February, 2007.

_____

SENIOR UNITED STATES DISTRICT JUDGE

---

[66] Other than the Human Resources Coordinator position, the only claims remaining in this case are those related to the following promotion decisions: Ben Mitchell, white male, to the position of Alabama Power Co. Assistant Branch Manager; Brian Kelley, white male, to the position of Van Branch Assistant Manager; Ryan Wood, white male, to the position of Irondale Assistant Branch Manager; Jay Fitzgerald, white male, to the position of Pell City Assistant Branch Manager; Jared Brooks, white male, to the position of Anniston Assistant Branch Manager; Craig Hansen, white male, to the position of Vehicle Repair Coordinator; Christy White, white female, to the position of Tuscaloosa Assistant Branch Manager; and Kevin Rosenberg, white male, to the position of Assistant Manager.  Those claims are the subject of defendant's second motion (doc. #29) for summary judgment.